# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HUMANA INC.,<br>ON BEHALF OF ITSELF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| BOEHRINGER INGELHEIM PHARMA GmbH & CO. KG; BOEHRINGER INGELHEIM INTERNATIONAL GmbH; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; BARR PHARMACEUTICALS, INC.; DURAMED PHARMACEUTICALS, INC.; and DURAMED PHARMACEUTICALS SALES CORP., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

**Table of Contents**

                                                                                                    **Page**

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    PARTIES ............................................................................................................ 6

IV.     REGULATORY AND ECONOMIC BACKGROUND ...................................... 9

        A.      The Hatch-Waxman Act and FDA Approval Process ............................. 9

        B.      The Economic Model of Prescription Drug Purchases and Sales......... 13

V.      FACTUAL ALLEGATIONS ............................................................................ 14

        A.      Barr's ANDA and Boehringer's Patent Infringement Suit ................... 14

        B.      Barr and Boehringer's Illegal Scheme to Thwart Generic Competition.............. 16

        C.      Boehringer Has Admitted that the Continuing Payments
                Under the Agreement Were Consideration for Barr's Agreement
                to Delay the Launch of Its Generic ...................................................... 18

        D.      Barr's Willingness to Delay Entry In Exchange for Lucrative
                Side Deal "Co-Promotion" Payments Was Consistent With its
                History and Pattern .............................................................................. 20

VI.     ANTICOMPETITIVE EFFECT ...................................................................... 22

VII.    EFFECTS ON INTERSTATE COMMERCE .................................................. 23

VIII.   MARKET POWER AND RELEVANT MARKET ........................................... 23

IX.     ANTITRUST INJURY .................................................................................... 25

X.      FRAUDULENT CONCEALMENT TOLLED TO STATUTE OF LIMITATIONS ...... 26

XI.     CLASS ACTION ALLEGATIONS ................................................................ 28

XII.    CLAIMS FOR RELIEF .................................................................................. 31

        FIRST CLAIM FOR RELIEF -
        For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act
        for Violations of Section 1 of the Sherman Act
        (On Behalf of Humana and the Antitrust Class Against All Defendants) ........... 31

SECOND CLAIM FOR RELIEF
For Conspiracy and Combination in Restraint of Trade Under State Laws
(On Behalf of Humana and the TPP Class Against All Defendants) ................... 33

THIRD CLAIM FOR RELIEF
Unfair and Deceptive Practices Under State Laws
(On Behalf of Humana and the State Law End Payer Class
Against All Defendants) ........................................................................................ 37

FOURTH CLAIM FOR RELIEF
Restitution for Unjust Enrichment
(On Behalf of Humana and the State Law End Payer Class
Against All Defendants) ........................................................................................ 39

XIII.   DEMAND FOR JUDGMENT ........................................................................................ 43

XIV.   JURY DEMAND .............................................................................................................. 44

Plaintiff Humana Inc. ("Humana"), on behalf of itself and all others similarly situated, for its Class Action Complaint ("Complaint") against Defendants Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim International GmbH, Boehringer Ingelheim Pharmaceuticals, Inc. (collectively, "Boehringer"); Teva  Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Limited (collectively, "Teva"); Barr Pharmaceuticals Inc. ("Barr"); Duramed Pharmaceuticals Inc. ("Duramed"); and Duramed Pharmaceuticals Sales Corp. (collectively, "Defendants"); alleges as follows based on: (a) first-hand knowledge; (b) the investigation of Humana's undersigned counsel; and (c) information and belief:

## I.    NATURE OF THE ACTION

1.    Aggrenox is a brand name prescription drug sold only by Boehringer, containing 200 mg extended release dipyridamole and 25 mg of aspirin (acetylsalicylic acid).  Aggrenox is used to decrease the risk of stroke in patients who have had a stroke or transient ischemic attack (a/k/a a "TIA" or "mini stroke").  The retail cost of a 30-day dose (60 capsules) of Aggrenox is more than $300.  Humana, one of the largest third party payers ("TPPs") in the United States for medical benefits, including prescription drugs, has paid more than $100 million for Aggrenox prescriptions since 2008.  There is no generic version of Aggrenox available in the United States.

2.    Humana brings this antitrust action for itself and (i) a proposed Rule 23(b)(3) class of persons or entities (the "State Law End Payer Class"), who have paid and/or co-paid pharmacies to dispense Aggrenox in the States at Issue (as defined below) during the period beginning August 14, 2008 and continuing until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"), and (ii) a proposed Rule 23(b)(2) nationwide class comprising persons or entities who or which have paid and/or co-paid pharmacies in the United States for Aggrenox during the Class Period (the "Sherman Act End Payer Class") (with the

State Law End Payer Class, the "Classes").

3.     Defendants have unlawfully entered into an agreement that has prevented less expensive generic versions of Aggrenox from becoming available in the United States, causing Humana and the Classes to pay inflated prices for this medicine.

4.     Humana seeks damages for itself and the State Law End Payer Class based upon the amounts Defendants' unlawful actions have caused it to overpay for Aggrenox and will continue to cause it to overpay for Aggrenox, and for generic versions of Aggrenox if and when they belatedly become available.

5.     Humana also seeks injunctive relief for itself and the Sherman Act End Payer Class to cause Defendants to discontinue actions illegally delaying the availability of generic Aggrenox.

6.     Since the United States Food and Drug Administration ("FDA") approved Aggrenox in 1999, Boehringer has charged monopoly prices for, and earn monopoly profits from, Aggrenox.  By 2008, Aggrenox had U.S. sales of approximately $330 million, which have since grown to more than $400 million per year.

7.     Generic drugs are much less expensive than their brand-name counterparts. Humana and most other endpayers would switch almost all of their purchases of monopoly-priced Aggrenox to the lower-priced generic version once the first generic substitute enters the U.S. market, and with much lower-priced generic versions after multiple generics become available.

8.     On or about May 31, 2007, Barr sought FDA approval to sell a generic version of Aggrenox, and certified to the FDA its generic did not infringe any valid patent held by Boehringer that covered Aggrenox.  Shortly thereafter, Boehringer sued Barr, alleging Barr

infringed Boehringer's U.S. Patent No. 6,015,577 (the "577 Patent") which expires in January 2017. By so doing, Boehringer triggered an automatic stay of the FDA's ability to approve Barr's generic version of Aggrenox for up to 30 months.

9.      To avoid (i) adjudication of the invalidity or non-infringement of the '577 Patent, or (ii) sale of generic Aggrenox upon FDA approval after the 30-month stay ended, either of which would have ended Boehringer's Aggrenox monopoly, in August 2008, Boehringer agreed to pay Barr (later acquired by Teva) approximately $120 million over seven years to (a) discontinue its challenge to the '577 Patent; and (b) delay selling a generic version of Aggrenox until July 1, 2015.

10.      The purpose and effect of this agreement was for the parties to allocate 100% of the market for Aggrenox and its generic equivalents to Boehringer through July 2015 in consideration of Boehringers' reverse payments to its alleged patent infringer Barr. This agreement is sometimes referred to herein as the "Reverse Payment Agreement" or the "Agreement."

11.      Boehringer and Barr's Reverse Payment Agreement preserved Boehringer's monopoly for approximately seven (7) additional years, or approximately 82% of the remaining life of the '577 Patent.

12.      Boehringer and Barr attempted to disguise the market allocation objective of their agreement by characterizing Boehringer's payments to Barr as consideration for the co-promotion of Aggrenox by Barr's subsidiary (Duramed) to obstetricians and gynecologists, doctors who treat a minute fraction of populations at risk for strokes and transient ischemic episodes, during the seven-year reverse payment period.

13.      Since August 2008, Boehringer has paid Barr (now Teva) tens of millions of

dollars under the Reverse Payment Agreement, and Barr has continued to delay the availability of generic Aggrenox.

14.     In connection with a Federal Trade Commission ("FTC") investigation of the Reverse Payment Agreement, the United States District Court for the District of Columbia found that the "co-promotion" deal was an "integral" part of the '577 Patent settlement, and Boehringer admitted the co-promotion payments were "inextricably interwined with" and "part of the consideration" for the '577 Patent settlement, and "informed" the settlement terms.

15.     Boehringer's "co-promotion" payments to Barr far exceed the fair value of Barr's services, because (i) Boehringer had no reasonable expectation of meaningful benefit from the promotion of Aggrenox, a drug for stroke patients, to  obstetricians and gynecologists; (ii) the "co-promotion" payments to Barr were calculated on total Aggrenox brand sales rather than on any increase in sales that might have resulted from Barr's promotion efforts; and (iii) the services to be provided by Barr were unnecessary and could have easily been obtained at far less cost. Boehringer's motive for paying Barr through July 2015 was to compensate Barr for dropping the '577 Patent challenge and delaying generic competition for Aggrenox at least until July 2015.

16.     For Barr, the deal with Boehringer made sense, because the payments were virtually pure profit, and Barr was cynically happy to make over $100 million without having to incur the costs of actual competition.  If Barr had turned down the deal and instead prosecuted its challenge to the 577 Patent successfully, it would likely have faced stiff competition: (a) from an authorized generic version of Aggrenox that Boehringer could have sold in competition with Barr; and (b) after Barr's 180 days of statutory exclusivity (barring competing versions of generic Aggrenox made by other *generic* companies from entering the market, but not an authorized generic made by Boehringer) ended, from other generic entrants whose entry to the

4

market would have driven prices of generic Aggrenox to commodity price levels. Such competition would have significantly benefitted Humana and other endpayers which would have paid lower prices for generic Aggrenox, at the expense of Barr and Boehringer, which have shared the profits from the continuation of Boehringer's brand Aggrenox monopoly.

17.     Despite receiving final FDA approval of Barr's ANDA for generic Aggrenox in August 2009, Teva (which acquired Barr in December 2009) has not yet introduced generic Aggrenox in the United States, choosing instead to accept tens of millions of dollars annually in "co-promotion" payments from Boehringer. Absent the payments Teva would already be competing in the market with lower priced generic versions of Aggrenox.

18.     Defendants' Agreement was intended to, did, and continues to: (a) preclude entry into the U.S. market of less expensive generic versions of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules; (b) fix, raise, maintain or stabilize the prices of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules; (c) permit Boehringer to monopolize the market for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in the United States; and (d) allocate 100% of the 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsule market in the United States to Boehringer.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, there are over one hundred members of the proposed class, and at least one member of the proposed class is a citizen of a state different from that of one of the Defendants.

20.     This Court also has jurisdiction over this matter under 15 U.S.C. § 26 and 28

U.S.C. §§ 1331 and 1337, because Humana asserts claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy the Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

21.    The Court has supplemental jurisdiction over Humana's pendent state law claims under 28 U.S.C. § 1367.

22.    This Court has personal jurisdiction over Defendants because they are present in the United States, do business in the United States, have registered agents in the United States, may be found in the United States, and are otherwise subject to the service of process provisions of 15 U.S.C. § 22.

23.    Defendants transact business within this District, and their interstate trade and commerce regarding Aggrenox is carried out in this District.  Venue, therefore, is appropriate within this District under  15 U.S.C.  § 22, and 28 U.S.C.  § 1391(b) and (c).

### III.    PARTIES

24.    Humana Inc. is a Delaware corporation, with its principal place of business at 500 West Main Street, Louisville, Kentucky.  Humana and its subsidiaries are managed care organizations which pay for prescription drugs for over six million people in every state and territory of the United States.  Humana provides medical and drug health care coverage throughout the United States through the following subsidiaries:  CarePlus Health Plans, Inc., Cariten Health Plan Inc., Cariten Insurance Company, CHA HMO, Inc., Emphesys Insurance Company, Humana AdvantageCare Plan, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Health Plan, Inc.,

Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Insurance of Puerto Rico, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc. and Humana Wisconsin Health Organization Insurance Corporation (collectively, Humana's "Operating Subsidiaries").  Humana's Operating Subsidiaries have assigned the claims pleaded herein to plaintiff Humana Inc.

25.     During the Class Period, Humana has already paid more than $100 million to purchase Aggrenox at monopoly prices from pharmacies in every state, and Humana will continue to have no choice but to continue to  purchase monopoly-priced Aggrenox until the Defendants' illegal market allocation scheme ends.

26.     After generic entry belatedly occurs, Humana's purchases of generic versions of Aggrenox will also include overpayments resulting from the Defendants' illegal scheme until the market for generic Aggrenox stabilizes to a "steady state."

27.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG ("BIPKG") is a limited partnership organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

28.     Defendant Boehringer Ingelheim International GmbH ("BII") is a private limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

29.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc ("BIPI") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 900 Ridgebury Road, Ridgefield Connecticut 06877.

30.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation, having a principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales,

Pennsylvania 19454.

31.     Defendant Teva Pharmaceutical Industries, Ltd. is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva, Israel.   Teva is a leading manufacturer of generic drugs, and it is one of the largest sellers of generic drugs in the United States. Teva purchased Barr in 2008, and Barr is now a wholly-owned subsidiary of Teva.

32.     Defendant Barr is a corporation organized under the laws of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Prior to 2004, Barr was known as Barr Laboratories, Inc.  In 2008, Barr became a wholly-owned subsidiary of Teva.

33.     Defendant Duramed Pharmaceuticals Inc. ("Duramed") is a corporation organized under the laws of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, Duramed was a subsidiary of Barr. In 2008, when Teva purchased Barr, Duramed became a subsidiary of Teva.  Duramed is now known as Teva Women's Health Inc.

34.     Defendant Duramed Pharmaceuticals Sales Corp. ("DPSC") is a corporation organized under the laws of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, DPSC was a subsidiary of Barr.  In 2008, when Teva purchased Barr, DPSC became a subsidiary of Teva.

35.     The actions taken by Defendants as described are part of, and were taken in furtherance of, the unlawful scheme alleged.  These actions were authorized, ordered, and/or done by the Defendants' officers, agents, employees, or other representatives while engaged in the management of the Defendants' affairs (or the affairs of Defendants' predecessors-in-

interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

## IV.   REGULATORY AND ECONOMIC BACKGROUND

### A.   **The Hatch-Waxman Act and FDA Approval Process**

36.     Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301-392), a manufacturer who creates a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and efficacy of the drug, as well as any information on applicable patents.

37.     In 1984, Congress amended the Food, Drug and Cosmetics Act with the enactment of the Hatch-Waxman Act ("Hatch-Waxman"). Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA to obtain FDA approval. Instead, the FDA provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA"). The ANDA applicant may rely on the safety and efficacy findings of the brand-name drug manufacturer in its NDA if the ANDA demonstrates its proposed generic drug is "bioequivalent" to the corresponding brand-name drug. Bioequivalence requires delivery of the same active ingredient into the body at the same rate as the brand.

38.     As a counter-balance, Hatch-Waxman streamlined the process for a brand-name manufacturer to enforce its patents against infringement by generic manufacturers, and provided the brand-name manufacturer with the ability to easily obtain what is essentially a preliminary injunction, in the form of a stay of up to 30 months of FDA approval of generic manufacturer's ANDAs.

39.     When the FDA approves a brand-name manufacturer's NDA, it lists in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book") any patents which, according to information supplied to the FDA by the brand-name manufacturer: (1) claim the approved drug or its approved uses; and (2) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner  engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(l); 21 U.S.C. § 355(g)(7)(A)(iii).

40.     To obtain FDA approval of an ANDA (and thus the right to sell a generic version of a brand-name drug), a generic manufacturer must certify that the generic drug addressed in its ANDA will infringe no patent listed in the Orange Book claiming the brand-name drug.  Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

     a.  that no patent for the brand-name drug has been filed with the FDA (a "Paragraph I Certification");

     b.  that the patent for the brand-name drug has expired (a "Paragraph II Certification");

     c.  that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

     d.  that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV Certification").

21 U.S.C. § 355(g)(2)(A)(vii).

41.     Alternatively, with a method-of-use patent, an ANDA may assert that the patent is inapplicable to the use (commonly referred to as the "indication") for which the drug product will be marketed (commonly called a "Section VIII Statement").

42.     When a generic manufacturer files a Paragraph IV Certification asserting that a patent listed in the Orange Book is invalid or will not be infringed, it must promptly give notice

10

of its certification to both the brand manufacturer and the owner of the patent. If either files a patent infringement lawsuit against the ANDA filer within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) 30 months or (b) a court ruling that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii).

43.     During the 30-month stay, the FDA may grant "tentative approval" to an ANDA applicant if the FDA determines that the ANDA would otherwise qualify for final approval, but cannot authorize the generic manufacturer to market its drug before the 30-month stay expires or a court rules on invalidity and infringement.

44.     Congress also created incentives for drug manufacturers to seek approval of generic alternatives to branded drugs and challenge weak patents. The Hatch-Waxman Amendments grant a 180-day period of market exclusivity to the first Paragraph IV ANDA applicant to file a substantially complete ANDA. During the 180-day exclusivity period (measured from the first commercial marketing of the generic), the first filer enjoys temporary freedom from competition from other generic versions of the drug, and can sell the generic for a higher price than when multiple generics enter the market. The brand name manufacturer may, however, market its own generic equivalent of the brand name drug (known as an "authorized generic") during the 180-day period giving endpayers three competing choices ((i) the brand-name drug; (ii) the Paragraph IV ANDA generic; and (iii) the authorized generic), resulting in even more competitive pricing.

45.     The first-filed generic manufacturer can forfeit its right to the 180-day period of exclusivity. This can occur, for example, when the first-filer fails to receive tentative approval of its ANDA from the FDA within 30 months of filing the ANDA.

46. Once a generic version of a branded drug is approved by the FDA, it receives an "AB" rating from the FDA. Typically, AB-rated generic versions of brand-name drugs are priced significantly below the brand-name counterparts. Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions are rapidly and substantially substituted for their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of a brand-name drug predictably decrease much more significantly because of price competition among the generic manufacturers, and because the shift of sales volume from the brand-name drug to the corresponding generics is so dramatic. The FTC estimates that the price for a generic version of a drug will drop more than 90 percent below the price of the branded product when multiple generics are on the market. *See, e.g.*, http://www.ftc.gov/sites/default/files/documents/public_statements/pay-delay-settlements-pharmaceutical-industry-how-congress-can-stop-anticompetitive-conduct-protect/090623payfordelayspeech.pdf .

47. An AB rating is critical to a generic manufacturer because, under the statutory regime enacted by both Congress (*i.e.*, Hatch-Waxman) and most state legislatures (*i.e.*, Drug Product Selection laws, or "DPS laws"), pharmacists may (and, in most states, must) substitute only an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor. Both Congress and the state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (a) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers; and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

48.     Generic competition enables purchasers to purchase generic versions of brand-name drugs at substantially lower prices. However, until generic manufacturers enter the market with an AB-rated generic, there is no bioequivalent generic drug which competes effectively with the brand-name drug, and therefore, the brand-name manufacturer can continue to charge and even increase at supra-competitive prices profitably without losing a substantial portion of its sales. Consequently, brand-name drug manufacturers have a strong incentive to use various tactics, including the tactics alleged, to delay the introduction of AB-rated generic competition into the market.

## B.  The Economic Model of Prescription Drug Purchases and Sales

49.     A prescription drug is typically sold in capsule or tablet form through a distribution chain of manufacturers to wholesalers to retail pharmacies, which deliver the product to patients with prescriptions. The drug passes in unaltered form through the chain from manufacturer to patient. This is the case with Aggrenox.

50.     Although a minority of patients do not have TPP pharmacy benefits, in the overwhelming majority of the cases, the end payer for a prescription drug is a dual payer comprising a patient and his TPP.

51.     The retail price end payers pay for a prescription drug is directly and inextricably intertwined with the wholesale prices charged by drug manufacturers, as the end payers are the source of drug manufacturers' revenues and the targets of drug manufacturers' marketing actions, including illegal and inequitable actions such as those described herein. This is the case with Aggrenox.

52.     Manufacturers of brand name prescription drugs sell the drug in tablet or capsule form, ready for consumption, to wholesalers and large pharmacies at a discount to the

13

manufacturer's published price.  Wholesalers in turn typically sell the branded drug to retail pharmacies at a slightly smaller discount from the published price, thereby achieving a small percentage markup.

53.    Virtually all United States pharmacies have dispensing contracts with TPPs. Under these contracts, for drugs dispensed to members of TPP plans, pharmacies typically charge the dual endpayers (the TPP and its plan member, i.e., the patient using the drug) a retail price based on a percentage of the published price, plus a dispensing fee of $1.00-$5.00 per prescription.  The pharmacies collect a co-payment from the member, which typically ranges from $10-$50 (with a lower co-payment for generic drugs), and the balance from the TPP.

54.    After AB-rated generic bioequivalents of a branded drug become readily available, TPPs reduce the amount they will pay to the pharmacy to a price based upon the lower price of the available generic.

55.    Thereafter, the TPP's members either accept the lower-priced generic (which generally also reduces the amount of his or her co-payment) or else pay the difference between what the TPP would pay for the generic versus the branded drug.

56.    Some health benefit plan members have a dual-payment relation which, instead of a flat co-payment by the consumer, comprises the member paying a percentage of the prescription cost and the TPP paying the balance.

57.    For the minority of consumers without a TPP co payer, the entire price of prescription drug is paid by such consumers.

## V.    FACTUAL ALLEGATIONS

### A.  Barr's ANDA and Boehringer's Patent Infringement Suit

58.    Boehringer is the holder of NDA No. 20-884, under which the FDA approved

in 1999 for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules.  The

dipyridamole / 25 mg acetylsalicylic acid capsules described in Boehringer's NDA are

prescribed to reduce the risk of stroke in patients who have had transient ischemia of the

brain or completed ischemic stroke due to thrombosis.

59.     Either directly or through affiliates BII and BIPI, Boehringer owns the '577

Patent, which issued on January 18, 2000, and is entitled, "Pharmaceutical Compositions

Containing Dipyridamole or Mopidamol and Acetylsalicylic Acid of the Physiologically

Acceptable Salts Thereof, Processes for Preparing Them and Their Use in Treating Clot

Formation."  After receiving FDA approval, Boehringer listed the '577 Patent in the Orange

Book as claiming to Aggrenox.

60.     In May 2007, Barr submitted ANDA No. 78-804 to the FDA, seeking approval to

sell 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules as AB-rated

generic equivalents of Aggrenox.  On or about May 31, 2007, Barr notified Boehringer it had

filed ANDA No. 78-804, with a Paragraph IV Certification that the commercial manufacture, use

and/or sale of its generic Aggrenox would infringe no valid claim of the '577 Patent.  As the

first-filer of an ANDA for generic Aggrenox, once its ANDA was approved by the FDA, Barr

would have been entitled to market its generic Aggrenox for 180 days free of competition from

other ANDA-based generic versions of Aggrenox.  However, this exclusivity period would not

have insulated Barr from competition by Boehringer with its own, less expensive, authorized

generic.

61.     On July 11, 2007, Boehringer sued Barr in the United States District Court for the

District of Delaware (Dkt. No. 07-cv-00432), alleging Barr's filing of its ANDA infringed upon

the '577 Patent.  Boehringer's infringement suit triggered the automatic stay of the FDA's

approval of Barr's generic product, which would remain in effect until the earlier of (i) 30

months or (ii) a court ruling the '577 Patent was invalid or not infringed or dismissal with

prejudice of Boehringer's '577 Patent infringement claims.  Barr counterclaimed, seeking

Declaratory Judgments that: (1) the '577 Patent was invalid; (2) Barr's proposed generic product

did not infringe the '577 Patent; and (3) the '577 Patent was unenforceable for inequitable

conduct.

## B. Barr and Boehringer's Illegal Scheme to Thwart Generic Competition

62.     On August 11, 2008, Boehringer and Barr entered into the Reverse Payment

Agreement, pursuant to which Barr agreed to drop its challenges to the '577 Patent and to refrain

from launching a generic equivalent of Aggrenox for seven (7) years – until as late as July 1,

2015, effectively preserving Boehringer's branded Aggrenox's monopoly for approximately 82%

of the then-remaining patent life on the '577 Patent (which expires on January 17, 2017).

63.     Under the Reverse Payment Agreement, Boehringer agreed (a) to make "co-

promotion" payments estimated at $120 million over the life of the Agreement; and (b) not to

compete against Barr's post-July 2015 sale of generic Aggrenox with its own authorized generic

version of Aggrenox.

64.     The Medicare Prescription Drug, Improvement, and Modernization Act of 2003

("MMA") required the settlement and Reverse Payment Agreement to be filed with the FTC.  On

January 15, 2009, the FTC opened a formal investigation of the Boehringer-Barr settlement.  As

a part of that investigation, on February 5, 2009, the FTC issued a subpoena *duces tecum* to

Boehringer requiring Boehringer to produce documents and data relating to the patent litigation

regarding Aggrenox; documents regarding sales, profits, and marketing plans for Aggrenox;

documents relating to the agreements between Boehringer and Barr entered when the patent

litigation settled; documents relating to Boehringer's co-marketing of products (including

Aggrenox) with other firms; documents relating to the marketing of authorized generic versions

of Boehringer's products; and analyst reports relating to Aggrenox.

65.     One of the FTC's top priorities in recent years has been to identify and challenge

agreements between drug manufacturers to stifle generic competition.  According to an FTC

study, these anticompetitive deals cost endpayers and taxpayers $3.5 billion annually.  *See*

http://www.ftc.gov/news-events/media-resources/mergers-and-competition/pay-delay.

66.     In October 2009, the FTC filed a Petition to enforce the subpoena *duces tecum*

against Boehringer in the United States District Court for the District of Columbia.

67.     The record from the FTC subpoena enforcement action confirmed that the

monies Boehringer agreed to pay Teva/Barr under the Reverse Payment Agreement were not

based on the extent to which to the Teva/Barr promotion services increased Aggrenox's sales,

as would be expected with a fair value for services promotion agreement.  Rather, the

Reverse Payment Agreement entitled Teva/Barr to an initial, upfront payment and annual

payments calculated as a percentage of the annual net sales of all Aggrenox units in the U.S.

As the U.S. Federal Trade Commission ("FTC") stated:

> The terms of the co-promotion agreement reveal that it was a
> significant   financial   transaction.   Under   the   agreement,
> Boehringer agreed to pay Barr a one-time fee plus annual,
> increasing royalties on total U.S. Aggrenox sales for a period of
> years . . . . In 2008, Aggrenox had total U.S. sales of about $366
> million . . . . At this level of sales, the FTC estimates that the
> deal would ultimately cost Boehringer over $120 million in
> royalties.

*See Brief of Appellant Federal Trade Commission*, June 28, 2013, Case No. 12-5393 (D.C.

Cir.), Dkt. No. 21, at 36, n. 12.

68.     The co-promotion payments were not intended to be fair value for "co-

promotion" services, because Boehringer had no reasonable expectation of receiving significant financial benefit from the promotion of Aggrenox, a drug for patients who have suffered strokes, to obstetricians and gynecologists. The FTC observed:

> At the same time [that the parties entered into the settlement agreements], Boehringer partnered with Barr to co-promote Aggrenox to women's health care professionals. Under that arrangement, Boehringer agreed to provide Barr with substantial compensation, including royalties based on net sales of Aggrenox.

*See Memorandum in Support of Petition of the Federal Trade Commission for an Order Enforcing a Subpoena Duces Tecum*, Oct. 23, 2009, Case No. 09- mc-00564 (D.D.C.), Dkt. No. 1-4, at p. 5. Also, Barr was not providing anything to Boehringer it could not obtain or provide for itself at less cost.

69.     The amounts that Boehringer agreed to pay to Barr under the Reverse Payment Agreement were also far in excess of the litigation costs that Boehringer could reasonably have expected to incur from continuing to prosecute the '577 Patent litigation against Barr through final judgment.

### C. Boehringer Has Admitted that the Continuing Payments Under the Agreement Were Consideration for Barr's Agreement to Delay the Launch of Its Generic

70.     The record in the FTC subpoena enforcement action against Boehringer reveals: (a) the co-promotion deal arose during the settlement of the '577 Patent litigation; (b) the "co-promotion" deal payments were "inextricably intertwined with [the] settlement negotiations," part of "the flow of compensation" and "part of the considerations of the settlement" of the '577 Patent litigation; and (c) Boehringer would not have agreed to make the "co-promotion" unless Barr agreed to the delay the launch of its generic version of Aggrenox.

71.     During a December 9, 2011 hearing in connection with the FTC's motion to

18

compel, Boehringer' s lawyer admitted:

> We have always said that the Aggrenox co-promote was part of the settlement. It had – It absolutely was. It's plain from the face of the documents.

*See Transcript of Dec. 9, 2011 Status Hearing Before the Honorable John M. Facciola, United States Magistrate Judge*, Case No. 09-mc-00564 (D.D.C.), at 36:19-21.

39.     He also admitted that:

> The settlement documents make clear that the Aggrenox co-promote was part of the settlement, right, and our point has always been, look, it's not a quid pro quo in the sense that the FTC says it is somehow pernicious because it has independent value, right. Even apart from the settlement, it might have made sense to enter into the co-promote because both parties got value from that agreement, but it was certainly part and parcel of the settlement. **It was part of the flow of compensation. It was part of the considerations of the settlement and so it is really a mischaracterization or misdescription to say that we said it was a stand alone.**

*Id*. at 37: 1-13 (emphasis added).

72.     Magistrate Judge John M. Facciola found the continuing co-promotion payments to Barr were "integral" to the '577 Patent settlement:

> **BIPI [Boehringer] claims that, while the co-promotion agreement was "freestanding," in that it constituted a separate business arrangement, the terms of the co-promotion agreement were indeed part of the litigation settlement and the two processes informed one another. BIPI asserts that the co-promotion agreement arose during the settlement discussions and, in fact, was part of the settlement.**
>
> After reviewing these documents, the status reports and oppositions, and affidavits accompanying the in camera submissions, I agree that the co-promotion agreement was an **integral part** of the litigation.

*See Memorandum Opinion* dated Sept. 27, 2012, Case No. 09-mc-00564 (D.D.C.), Dkt. No. 69, at p. 10 (emphasis added).

73.     In 2012, the FTC appealed the district court's ruling denying the FTC's petition to the United State Court of Appeals for the Federal Circuit. In its August 28, 2013 appellee brief, Boehringer admitted the co-promotion arrangement was "inextricably intertwined with settlement negotiations," of the '577 Patent litigation. *See Brief of Respondent-Appellee Boehringer Ingelheim Pharmaceuticals, Inc.*, Case No. 12-5393 (D.C. Cir.).

### D. Barr's Willingness To Delay Entry In Exchange for Lucrative Side Deal "Co-Promotion" Payments Was Consistent With Its History and Pattern

74.     These transactions were standard practice for Barr. Bruce Downey (Barr's CEO during the settlement negotiations with Boehringer) acknowledged in a January 17, 2007 written statement to the U.S. Senate regarding the topic, "Paying off Generics to Prevent Competition with Brand-name Drugs: Should It Be Prohibited?":

> Consideration in addition to early entry can be useful in bridging the gap between the generic company's proposed entry date and the branded company's proposed entry date. A branded company that is dead set against an earlier entry date may nevertheless be willing to provide economic value other than early entry in order to persuade the generic company to accept a later entry date.

*See* http://www.judiciary.senate.gov/hearings/testimony.cfm?id=e655f9e2809e5476862f735dalle5c9b&witid=e655f9e2809e5476862f735dalle5c9b-2-2.

75.     Downey also gave oral testimony at the Senate hearing on January 17, 2007 in which he admitted the following regarding Barr's practices:

> The collateral agreements that narrow the gap are not always cash payments.  In fact, they rarely are in our case. They involve some other asset that has a different value for us than it does the brand. Sometimes, for example, we have purchased a product from the brand at a price we think is favorable - it is an asset that is not key to them-as part of the settlement where we have shortened the patent life. In other cases, we have licensed a patent from a brand as part of a settlement where we have shortened the patent life. In other cases, we have agreed to co-promote products for the brand

> company as part of the settlement where we have shortened the patent life. In other cases, we have entered into an R&D agreement with a brand company as part of a settlement where we shortened the patent life.

*See* "Paying Off Generics to Prevent Competition with Brand -name Drugs: Should it be Prohibited?" – Hearing Before the Committee on the Judiciary, United States Senate, One Hundred Tenth Congress, First Session, Jan. 17, 2007, Serial No. J-110-4 (U.S. Government Printing Office), at 28, *available at* http://www.gpo.gov/fdsys/pkg/CHRG- 110shrg33401/pdf/CHRG- 110shrg33401.pdf (emphasis added).

76.     On August 14, 2008, Boehringer's '577 Patent infringement action against Barr was dismissed with prejudice.

77.     On December 23, 2008, Barr became a wholly-owned subsidiary of Teva. On August 14, 2009, Teva received final FDA approval of ANDA No. 78-804, but still has not begun selling its approved generic equivalent of Aggrenox, and Boehringer has continued to make the agreed-upon payments to Teva, because Boehringer and Barr agreed to do all things reasonably necessary to further the intent and purposes of the transactions contemplated by the Reverse Payment Agreement.

78.     Since entering into the Reverse Payment Agreements, Boehringer has more than doubled the wholesale price for Aggrenox, and retail prices have increased commensurately.

79.     But for the parties' ongoing performance under the Reverse Payment Agreement, generic competition for Aggrenox would have occurred as early as August 2008, and thereafter the amounts paid by endpayers for the drug would have been lower than they were in 2008. As of today, there is still no generic equivalent of Aggrenox on the market in the United States. Boehringer continues to sell branded Aggrenox at artificially inflated prices, and Humana and other endpayers have been overcharged, and will continue to be overcharged, until there is steady

state, *i.e.*, there is generic competition for Aggrenox unimpeded by the anticompetitive effects of the Defendants' agreement.

80.      But for Defendants' ongoing, illegal anticompetitive conduct, Humana and other members of the Classes would have paid lower prices for Aggrenox since as early as August 14, 2008. Defendants, by their conduct, have injured Humana and other members of the Classes by causing them to pay over hundreds of millions of dollars for Aggrenox.

## VI.    ANTICOMPETITIVE EFFECT

81.      The Reverse Payment Agreement has enabled the Defendants to: (a) prevent and delay the entry of less expensive generic versions of Aggrenox  in the United States; (a) fix, raise, maintain, or stabilize the price of Aggrenox; and (c) allocate among them, and share the profits from, 100% of the U.S. market for 200 mg extended-release dipyridarnole / 25 mg acetylsalicylic acid capsules to Boehringer.

82.      But for the continuing illegal agreements between Barr and Boehringer (which included financial inducements to delay the launch of less expensive generic versions of Aggrenox) Barr would have sold a less expensive AB-rated generic version of Aggrenox on or after August 14, 2008, but prior to the filing of this Complaint.  Other ANDA-based generic versions of Aggrenox would have followed into the market 180 days later and/or Boehringer would have launched an authorized generic product contemporaneously with the first generic launch.

83.      Defendants' unlawful concerted action has delayed or prevented the sale of generic Aggrenox in the United States, causing Humana and the class to overpay hundreds of millions of dollars for Aggrenox at Boehringer's artificially inflated, supra-competitive prices.

## VII.   EFFECTS ON INTERSTATE COMMERCE

84.   At all material times, Aggrenox, manufactured and sold by Boehringer, was shipped across state lines and sold to customers located outside its state of manufacture.

85.   During the relevant time period, in connection with the purchase and sale of Aggrenox, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

86.   During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged were within the flow of, and have substantially affected, interstate commerce.

## VIII.   MARKET POWER AND RELEVANT MARKET

87.   At all relevant times, Boehringer has had power over the market for 200 mg extended- release dipyridamole / 25 mg acetylsalicylic acid capsules, which is still available only in the form of brand Aggrenox. Boehringer has had the power to maintain and increase the price of Aggrenox at supra-competitive levels without losing sales, because Defendants have successfully conspired to keep AB-rated generic versions of Aggrenox from reaching the U.S. market at all.

88.   A small, but significant, non-transitory price increase for Aggrenox by Boehringer would not have caused a significant loss of sales.

89.   If Humana is legally required to prove market power through circumstantial evidence by first defining a relevant product market, the relevant market is 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules, *i.e.,* Aggrenox and its AB-rated generic equivalents, which this Complaint will hereafter sometimes refer collectively

for shorthand purposes as "Aggrenox therapy."

90.     Aggrenox is available only by doctor's prescription.  The doctor's prescription defines the relevant product market, since a prescription for a prescription drug may be filled only with the brand name drug named in the prescription or its AB-rated, FDA-approved generic equivalent.  So if a doctor prescribes "Aggrenox," the prescription may be filled only with brand Aggrenox until there is an AB-rated bioequivalent available.

91.     Aggrenox does not exhibit significant, positive cross-elasticity of demand regarding price with any other product, due to the FDA regulatory hurdles incident to securing this rating and laws allowing pharmacists to substitute only AB-rated generics for prescribed brand drugs.

92.     There are no interchangeable drug products available to endpayers for prescribed Aggrenox.

93.     Boehringer needed to control the output of Aggrenox and its AB-rated generic equivalents only, and no other products, to maintain the price of Aggrenox profitably at supra-competitive prices.  Only the market entry of a competing, AB-rated generic version of Aggrenox would render Boehringer unable to profitably maintain its current prices of Aggrenox without losing substantial sales.

94.     Boehringer also sold Aggrenox at prices well over marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

95.     Defendants have had, and exercised, the power to exclude and restrict competition for Aggrenox therapy.

96.     Without the power to exclude and restrict competition to 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules (Aggrenox and AB-rated

bioequivalent generics), and ability to sell its own branded version of that drug, Aggrenox, at prices well over marginal costs, it would not have been economically rational for Boehringer to pay Barr up to $120 million to delay Barr's launch of its AB-rated generic Aggrenox.

97.    Boehringer, at all times relevant, enjoyed the benefits of high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

98.    Boehringer has been able to profitably double the price of Aggrenox therapy to levels well above what they would be in a market unaffected by the Reverse Payment Agreement, all the while increasing its sales.

99.    The relevant geographic market is the United States and its territories. At all times relevant, Boehringer's market share in the relevant market was, and remains, 100%, demonstrating market power.

## IX.    ANTITRUST INJURY

100.    Humana and the Classes have spent hundreds of millions of dollars to purchase Aggrenox therapy. Because of the Defendants' illegal conduct, these purchasers were compelled to pay artificially inflated prices for Aggrenox. Those prices were substantially higher than the prices that Humana and the Classes would have paid absent the illegal conduct alleged.

101.    As a consequence, purchasers of Aggrenox have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

102.    Defendants' efforts to restrain competition in the market for Aggrenox have substantially affected interstate and intrastate commerce.

103.    Excluding generic competitors in the market place prevented price competition

for Aggrenox.

104.   Prices for Aggrenox therapy were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.  The inflated prices that Humana and the Classes have paid are traceable to, and the foreseeable result of, the overcharges by Boehringer.

## X.   FRAUDULENT CONCEALMENT TOLLED TO STATUTE OF LIMITATIONS

105.   Humana and class members did not know of the terms of Defendants' unlawful self-concealing Reverse Payment Agreement and could not have discovered the conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this complaint.

106.   This is true because Defendants' conspiracy was self-concealing and because the Defendants employed deceptive practices and techniques of secrecy to avoid detection of, and to fraudulently conceal, their contract, combination, and conspiracy. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Humana and class members by, among other things:

   a.   Concealing the amounts Boehringer was to pay and paid Barr/Teva under the Reverse Payment Agreement;

   b.   Concealing  that  the  purpose of  the co-promotion payments was to pay Barr to drop its challenge to the '577 Patent and delay entering the market with its generic Aggrenox;

   c.   Concealing that those amounts far exceeded any lawful economic benefit that Boehringer received from Barr/Teva under the agreement; and

  d. Filing documents with the SEC that failed to disclose the existence or nature of the Reverse Payment Agreement. Teva's SEC Form 20-F for the fiscal year ended December 31, 2008, filed on February 27, 2009, does not mention the settlement of the Aggrenox litigation. By contrast, Teva's fiscal 2008 20-F does mention that in 2008, "Barr signed a settlement and license agreement with Boehringer Ingelheim to resolve patent litigation involving Boehringer Ingelheim's Mirapex … Barr obtained the right to launch its generic version of Mirapex commencing no later than January 1, 2010." However, the same document makes no mention of Aggrenox settlement or Reverse Payment Agreement. Teva's SEC Form 20-F filings for the fiscal years 2009, 2010, 2011, and 2012 similarly failed to disclose the Aggrenox settlement or the Reverse Payment Agreement.

107. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Humana and the absent class members did not know of the conspiracy more than four years prior to the filing of this Complaint, nor the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

108. Humana and the absent class members also lacked the facts and information necessary to form a good faith basis for believing any legal violations had occurred, including the amounts of payments made from Boehringer to Barr/Teva under the Reverse Payment Agreement. Reasonable diligence by Humana and class members would not have uncovered those facts more than four years prior to the filing of this complaint.

109. Because of Defendants' fraudulent concealment, all applicable statutes of

limitations affecting Humana's and class members' claims have been tolled.

110.    Alternatively, if any statute of limitations is not tolled, this Complaint alleges a
continuing course of conduct (including conduct within the limitations period), and Humana and
class members can recover damages they suffered during the limitations period.

## XI.    CLASS ACTION ALLEGATIONS

111.    Humana brings its First Claim for Relief for Declaratory and Injunctive Relief
Under Section 16 of the Clayton Act for Violations of Section 1 of the Sherman Act for itself
and, under **Federal Rules of Civil Procedure 23(a) and 23(b)(2),** as representative of the
Sherman Act End Payer Class, defined as:

> All end payers that have paid pharmacies in the United States for
> Aggrenox during the Class Period.

112.    Humana brings its remaining Claims for Relief for violations of states' laws and
unjust enrichment for itself, and, under **Federal Rules of Civil Procedure 23(a) and 23(b)(3)**,
as a representative of the State Law End Payer Class, defined as:

> All persons and entities who or that have paid pharmacies in the
> following "States at Issue" during the Class Period: Alaska,
> Arizona, Arkansas, California, Colorado, Connecticut, Delaware,
> Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maryland,
> Massachusetts, Maine, Michigan, Minnesota, Mississippi,
> Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New
> York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania,
> South Dakota, Tennessee, Utah, Vermont, Washington, West
> Virginia, Wisconsin and the District of Columbia and Puerto Rico
> for Aggrenox prescriptions.

113.    The following persons or entities are excluded from the proposed Classes:

    a.    Defendants and their counsel, officers, directors, management, employees,
          subsidiaries, or affiliates;

    b.    All governmental entities, except for government funded employee
          benefit plans

114.    The class members are so numerous that joinder is impracticable.  Each class

comprises thousands of members.

115.    Humana's claims are typical of the claims of the members of the Sherman Act End Payer Class and State Law End Payer Class.  Humana and members of the Classes were damaged by the same wrongful conduct by the Defendants in that they paid artificially inflated prices for Aggrenox and were deprived of the benefits of earlier and more robust competition from cheaper generic equivalents of Aggrenox as a result of the Defendants' wrongful conduct.

116.    Humana will fairly and adequately protect and represent the interests of the classes.  Humana's interests are coincident with, and not antagonistic to, those of both the State Law End Payer Class and the Sherman Act End Payer Class.

117.    Humana's counsel, Lowey Dannenberg Cohen & Hart, P.C. has decades of experience in the prosecution of class action antitrust litigation involving prescription drugs  for end payer clients.  Over the years, Lowey has developed the expert knowledge and skills necessary to navigate and manage this form of complex class litigation.

118.    Regarding the Sherman Act End Payer Class, pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds that apply generally to the absent class members, such that the declaratory and injunctive relief sought is appropriate respecting the Class as a whole.

119.    Regarding the State Law End Payer Class, pursuant to Federal Rule of Civil Procedure 23(b)(3), questions of law and fact common to the class members predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire Class, making overcharge damages with respect to the class as a whole appropriate.

120.    Questions of law and fact common to members of the State Law End Payer Class

include:

    a.   Whether Boehringer entered into a contract, combination, or conspiracy with Barr to restrain trade and, if so, whether it should be evaluated under the rule of per se illegality, the "rule of reason," or any other rule or standard;

    b.   Whether Teva joined the unlawful agreement on its own behalf and for Barr;

    c.   Whether Defendants unlawfully excluded competitors and potential competitors from the market for Aggrenox;

    d.   Whether Defendants unlawfully delayed or prevented generic manufacturers from coming to market in the United States;

    e.   Whether Defendants' conduct substantially affected interstate commerce;

    f.   Whether Defendants maintained market power by delaying generic entry;

    g.   Whether the law requires definition of relevant market when direct proof of market power is available, and if so, the definition of the relevant market;

    h.   Whether and to what extent, Defendants' conduct caused injury (*i.e.*, overcharges) to Humana and the members of the State Law End Payer Class; and

    i.   The aggregate overcharge damages to be awarded to the State Law End Payer Class.

121.   Class action treatment is a superior method for the fair and efficient adjudication of this case. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

The benefits of proceeding through the class action mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

122.    Humana knows of no special difficulty to be encountered in the maintenance of this litigation that would preclude its maintenance as a class action.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Violations of Section 1 of the Sherman Act (On Behalf of Humana and the Antitrust Class Against All Defendants)**

123.    Humana incorporates the preceding paragraphs by reference.

124.    The Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to delay and block entry of AB-rated generic equivalents of Aggrenox. The Defendants injured Humana and the Sherman Act End Payer Class members through an agreement to exclude generic Aggrenox from the market in exchange for substantial payments from Boehringer to Barr and Teva.

125.    Had manufacturers of generic Aggrenox entered the market and lawfully competed with Boehringer in a timely fashion, Humana and the members of the Sherman Act End Payer Class would have substituted lower-priced generic Aggrenox for the higher-priced brand name Aggrenox for most of their purchases, and TPPs would have paid lower net prices for brand Aggrenox.

126.    The Defendants intended, and accomplished, a horizontal market allocation of the Aggrenox market, which is a per se violation of Section 1 of the Sherman Act. By their agreement, the Defendants intentionally and wrongfully conspired and combined in an

unreasonable restraint of trade in violation of Section 1 of the Sherman Act. Because of this unreasonable restraint on competition, Humana and the members of the Sherman Act End Payer Class paid artificially inflated prices for Aggrenox.

127.   Humana and the absent class members have suffered harm, and will continue to suffer harm in the future as a result of paying higher prices for Aggrenox than they would have absent Defendants' anticompetitive conduct and continuing anticompetitive agreement. Humana and the Sherman Act End Payer Class members also face a continuing threat of injury from the unlawful conduct alleged .

128.   Humana and the Sherman Act End Payer Class have purchased substantial amounts of Aggrenox during the Class Period.

129.   As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox, and by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct. Teva is also liable for its own unlawful conduct.

130.   Humana and the Sherman Act End Payer Class seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that the Defendants' conduct violates Section 1 of the Sherman Act.

131.   Humana and the Sherman Act End Payer Class also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the Defendants' unlawful conduct, and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

## SECOND CLAIM FOR RELIEF

### For Conspiracy and Combination in Restraint of Trade Under State Laws
### (On Behalf of Humana and the TPP Class Against All Defendants)

132.   Humana incorporates the preceding paragraphs by reference.

133.   In 2008, Boehringer and Barr entered into the Reverse Payment Agreement to suppress generic competition with Aggrenox.  Teva joined and continued the unlawful agreement to suppress generic competition.  The Reverse Payment Agreement is a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

    a.   Allocate all sales of Aggrenox and/or generic Aggrenox in the United States to Boehringer until at least July 1, 2015;

    b.   Prevent each of the Defendants from selling a generic equivalent of Aggrenox in the United States until July 1, 2015;

    c.   Prevent Boehringer from competing against Barr/Teva with an authorized generic version of Aggrenox once Barr/Teva launch on July 1, 2015;

    d.   Fix at supra-competitive levels the price that Humana and the members of the State Law End Payer Class paid for Aggrenox; and

    e.   Fix at supra-competitive levels the price that Humana and members of the State Law End Payer Class will pay for generic Aggrenox when it is launched on or after July 1, 2015.

134.   The Reverse Payment Agreement has harmed Humana and the State Law End Payer Class members.

135.   The Reverse Payment Agreement has covered a sufficiently substantial

percentage of the relevant market to harm competition.

136.    The Reverse Payment Agreement is a horizontal market allocation and price fixing agreement between actual and potential competitors and is illegal per se under state antitrust laws.  Alternatively, Humana alleges the Reverse Payment Agreement is an unreasonable restraint of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis.

137.    There is and was no legitimate, non-pre-textual, pro-competitive business justification for the Reverse Payment Agreement that outweighs its harmful effect.  Even if there were such a justification, the Reverse Payment Agreement is and was broader than necessary to achieve any pro-competitive purpose.

138.    The Defendants' conduct violated the following state antitrust or competition practices laws:

        a.    Arizona Rev. Stat §§ 44-1402, *et seq.*, with respect to purchases in Arizona by Humana and members of the Class;

        b.    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by Humana and members of the Class;

        c.    D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases in the District of Columbia by Humana and members of the Class;

        d.    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Humana and members of the Class;

        e.    Haw. Rev. Stat. § 480-1, *et seq.*, with respect to purchases in Hawaii by Humana and members of the Class;

        f.    740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by Humana and members of the Class;

        g.    Iowa Code § 553.2 *et seq.*, with respect to purchases in Iowa by Humana and members of the Class;

        h.    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas

by Humana and members of the Class;

i.    Mass. Gen. L. Ch 93A, *et seq.*, with respect to purchases in Massachusetts by Humana and members of the Class;

j.    Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases in Maine by Humana and members of the Class;

k.    Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by Humana and members of the Class.

l.    Minn. Stat. §§ 325D.51, *et seq.*, with respect to purchases in Minnesota by Humana and members of the Class;

m.    Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by Humana and members of the Class;

n.    Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by Humana and members of the Class;

o.    Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by Humana and members of the Class;

p.    N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by Humana and members of the Class;

q.    New York General Business Law § 340, *et seq.*, with respect to purchases in New York by Humana and members of the Class;

r.    N.C. Gen. Stat. §§ 75-1, *et eq.*, with respect to purchases in North Carolina by Humana and members of the Class;

s.    N.D. Cent. Code § 51-08.1-02, *et seq.*, with respect to purchases in North Dakota by Humana and members of the Class;

t.    Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by Humana and members of the Class;

u.    10 L.P.R.A. § 251, *et seq.*, with respect to purchases in Puerto Rico by Humana and members of the Class;

v.    R.I. Gen. Laws §§ 6-36-4 *et seq.*, with respect to purchases in Rhode Island by Humana and members of the Class;

w.    S.D. Codified Laws Ann. § 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by Humana and members of the Class;

x.    Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by Humana and members of the Class;

y.     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by Humana and members of the Class;

z.     Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases in Vermont by Humana and members of the Class;

aa.    W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by Humana and members of the Class;

bb.    Wis. Stat. § 133.03, *et seq.*, with respect to purchases in Wisconsin by Humana and members of the Class.

139.    Humana purchased Aggrenox from retail pharmacies in each of these states during the Class Period.

140.    Humana and the members of the Class have been injured in their business or property by Defendants' antitrust violations. Their injuries comprise (1) being denied the opportunity to purchase lower-priced generic Aggrenox, and (2) paying higher prices for Aggrenox than they would have paid in the absence of defendants' wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

141.    As a successor-in-interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox, and by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct. In addition, Teva is liable for its own unlawful conduct.

142.    Humana and the members of the State Law End Payer Class seek damages and multiple damages as permitted by law for the injuries they suffered because of the Defendants' anticompetitive conduct.

143.    Defendants are jointly and severally liable for all damages suffered by Humana and the State Law End Payer class members.

36

## THIRD CLAIM FOR RELIEF

**Unfair and Deceptive Practices Under State Laws**
**(On Behalf of Humana and the State Law End Payer Class Against All Defendants)**

144.    Humana re-alleges the preceding paragraphs as though set forth herein.

145.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed by, among other things, (a) wrongfully conducting baseless litigation to trigger the automatic 30-month stay prohibiting the FDA from granting final approval permitting Barr/Teva to market its less-expensive authorized generic version of Aggrenox; (b) entering into the Reverse Payment Agreement whereby Boehringer agreed to pay Barr in exchange for Barr's commitment to postpone marketing its generic version of Aggrenox; (c) compensating Barr $120 million in one-time and yearly royalty payments under a valueless, sham "co-promotion" agreement; and (b) agreeing not to compete against Barr with Boehringer's own authorized generic Aggrenox.  As a result of the Reverse Payment Agreement, Barr (and later Teva, once Teva acquired Barr) has, in fact, delayed marketing its less expensive Aggrenox, despite having FDA approval to do so.

146.    As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana and the State Law End Payer Class members were deprived of the opportunity to purchase a generic version of Aggrenox and were forced to pay higher prices for brand name Aggrenox from August 14, 2009 through the present.

147.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*.

148.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq*.

149.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq*.

37

150.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq.*

151.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat § 6-1-105, *et seq.*

152.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*

153.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code 2511, *et seq.*

154.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, *et seq.*

155.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*

156.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*

157.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*

158.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*

159.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*

160.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*

161.    Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Mass. Gen. L. Ch. 93A, *et seq*.

162.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq*.

163.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq*.

164.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq*.

165.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010, *et seq*.

166.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*.

167.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq*.

168.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*.

169.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, *et seq*.

170.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*.

171.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*.

172.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq*.

173.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Code Ann. § 4165.01, *et seq*.

174.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq*.

175.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq*.

176.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq*.

177.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq*.

178.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq*.

179.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451, *et seq*.

180.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq*.

181.    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*.

182.    Humana purchased Aggrenox from retail pharmacies in each of these jurisdictions during the Class Period.

183.    Humana and members of the State Law End Payer Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, or deceptive acts alleged in this Count.  Their injury consists of paying higher prices for Aggrenox prescription

drugs than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and proximately results from Defendants' unlawful conduct.

## FOURTH CLAIM FOR RELIEF

### Restitution for Unjust Enrichment
**(On Behalf of Humana and the State Law End Payer Class Against All Defendants)**

184.    Humana incorporates the preceding paragraphs by reference.

185.    To the extent required, this claim is pled in the alternative to the other claims under FED. R. CIV. P. 8(d).

186.    Defendants have benefited from the revenue they have generated from Aggrenox made, resulting from the acts alleged in this Complaint.

187.    Defendant Barr (and Barr's successor, Teva) has benefitted from the acts alleged in this Complaint to the extent of the payments (approximately $120 million in total) that it has received and continues to receive under the Reverse Payment Agreement. The funds for such payments by the Boehringer Defendants derived from Humana's and the State Law End Payer Class' overpayments for Aggrenox.

188.    Humana and the State Law End Payer Class members have conferred an economic benefit upon the Defendants in the nature of revenue resulting from payments made during the pendency of the antitrust conspiracy, to Humana's and the State Law End Payer Class' detriment.

189.    The economic benefit of payments made by the State Law End Payer Class members during the conspiracy is a direct and proximate result of Defendants' anticompetitive behavior restricting competition as set forth above.

190.    The benefit held by the Defendants rightfully belongs to Humana and the State

Law End Payer Class, as Humana and the absent members of the Class paid these inequitable sums to Defendants during the Class Period, when Defendants used illicit and inequitable measures to prevent generic entry into the market.

191.   It would be inequitable for Defendant Barr (and Barr's successor, Teva) to retain any of the proceeds of the Reverse Payment Agreement.

192.   It would be inequitable for the Boehringer Defendants to be permitted to retain any of the revenue generated from Humana's and the State Law End Payer Class' payments from Aggrenox derived from their unfair and unconscionable methods, acts, and trade practices, including, but not limited to, the Reverse Payment Agreement and the acts alleged herein, designed to prevent introduction by Barr and others of generic bioequivalents to Aggrenox.

193.   It would be futile for Humana and the State Law End Payer Class to seek a remedy from any party with whom they had or have privity of contract.  Defendants have paid no consideration to anyone for any of the illicit and inequitable benefits they received from Humana and class members.

194.   Defendants are aware of and appreciate the benefits they obtained inequitably that came from Humana and the members of the State Law End Payer Class.

195.   Defendants should be compelled to disgorge all incremental proceeds they obtained inequitably as a result of the unjust conduct alleged herein in a common fund for the benefit of Humana and State Law End Payer Class members.

196.   A constructive trust should be imposed upon all sums the Defendants obtained inequitably that are traceable to Humana and State Law End Payer Class members.

197.   Humana and the State Law End Payer Class members have no adequate remedy at law.

198.     As a successor in interest to Barr, Teva is liable for all of Barr's inequitable conduct in connection with Aggrenox, and by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing illicit and inequitable course of conduct.  In addition, Teva is liable for its own unlawful conduct.

## XIII.   DEMAND FOR JUDGMENT

WHEREFORE, Humana, on behalf of itself and the Sherman Act End Payer Class and the State Law End Payer Class, respectfully prays that the Court:

A.     Determine that this action may be maintained as a class action pursuant to FED. R. CIV. P. 23(a), (b)(2) and (b)(3), and direct that reasonable notice of this action, as provided by FED. R. CIV. P. 23(c)(2) be given to the Classes and declare Humana the representative of the Classes;

B.     Enter Judgment against Defendants jointly and severally in favor of Humana and the Classes;

C.     Adjudge and decree the acts alleged herein, pursuant to FED. R. CIV. P. 57 and 18 U.S.C. § 2201(a), to be in violation of the Sherman Act and the state laws identified above;

D.     Award the State Law End Payer Class actual damages and multiple damages or punitive damages where available by law in an amount to be determined at trial;

E.     Permanently enjoin the Defendants from continuing their unlawful conduct, to assure that similar anticompetitive conduct does not occur in the future;

F.     Disgorge from Defendants all illicit and inequitable sums they received due to their improper conduct and establish a constructive trust over these monies;

G.     Award Humana and the Classes their costs of suit, including reasonable attorneys' fees as provided by law;

H.      Grant any such other further relief to which Humana may be entitled and/or is necessary to correct the anticompetitive effects caused by the unlawful conduct of Defendants and as the Court deems just and/or equitable.

## XIV.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Humana, on behalf of itself and the proposed Classes, demands a trial by jury on all issues so triable.

Dated:  April 28, 2014
       White Plains, New York

              LOWEY DANNENBERG COHEN
              & HART, P.C.

              By: /s/ Peter D. St. Phillip
                    Peter D. St. Phillip (District of Connecticut
                    Bar No. ct29379
                    Barbara Hart
                    Gerald Lawrence
                    Richard W. Cohen
                    Noelle Ruggiero
                    One North Broadway
                    White Plains, New York 10601
                    Tel.: 914-997-0500
                    Fax: 914-997-0035

                    RAWLINGS & ASSOCIATES PLLC
                    Mark D. Fischer
                    Robert Griffith
                    One Eden Way
                    LaGrange, KY  40031-8100
                    Telephone:  502-587-1279

                    *Attorneys for Plaintiff*